### WADE SIMMONS v. THE STATE.

#### No. 4052.    Decided December 2, 1908.

**1.—Seduction—Charge of Court—Definition of Offense.**

Under the penal law of Texas an unchaste woman can not be seduced; in order to be seduced she must be led away from the path of virtue by a promise of marriage, and the carnal intercourse must occur by virtue of the promise of marriage.

**2.—Same—Charge of Court—Requested Charges.**

Where upon trial for seduction the court charged that if the jury believed that the prosecutrix had intercourse with another or others than the defendant prior to such intercourse with the defendant (if she had intercourse with defendant) or if they had a reasonable doubt as to whether she did or not to find the defendant not guilty; and did not apply his charges fully to the facts of the case, as requested by special charges of the defendant, the same was reversible error.

**3.—Same—Requested Charges.**

See opinion for requested charges in a case of seduction which should have been given to the jury.

Appeal from the District Court of Haskell. Tried below before the Hon. C. C. Higgins.

Appeal from a conviction of seduction· penalty, two years imprisonment in the penitentiary.

The opinion states the case.

*H. G. McConnell, M. Herring, J. E. Bradley* and *Williams & Bradley,* for appellant.—Cited cases in opinion.

*F. J. McCord,* Assistant Attorney-General, for the State.

DAVIDSON, Presiding Judge.—The indictment is in the usual form, charging appellant with the seduction of Miss Bessie James in Haskell County.

The record discloses that Miss Bessie James and appellant became acquainted with each other in McLennan · County about Christmas, 1904. That he began waiting on her in the summer of 1905, about the first of June, and continued going with her until his return from Haskell County to McLennan County, about August, 1906. The father of prosecutrix moved from McLennan to Haskell County the latter part of December, 1905, carrying prosecutrix with him. That about the 10th of January, 1906, appellant also went to Haskell County, and while there would go to the residence of Mr. James, where his daughter Bessie lived, about every week; some times when not employed he stayed there several days. Usually, when employed, he would spend Sunday with the James family. They became engaged to be married in McLennan County before moving to Haskell County under her testimony and intended to be married along in the winter of 1905-6, but for some reason it was put off, and it was discussed from time to time between herself and appellant. Finally, they fixed the time to marry in August, 1906, with a view of then returning to McLennan County. She says the first time appellant had intercourse with her was about the first of March, 1906, in what she calls the Logan house where her father resided; that it was at night and upstairs. She says: "At that time he asked me to let him have intercourse with me and I told him no. The reason for saying no to him was because I didn't have any faith in what he said. He told me that it would be all right, and that there was no use of being scared of anything. I told him that I was scared. I don't know what I was scared of—I was scared of being caught up, of getting with child, and I told him that. He told me. that he would marry for sure. He had intercourse with me along at times up until he went back home in McLennan County in August after he commenced it in March before that time. From having intercourse with Wade Simmons I became pregnant. That was in May that I became pregnant as near as I can tell. I have since that time given birth to a baby; the birth of the baby was on the 11th

day of February, 1907. The child that was born at that time was Wade Simmons'. It is a boy. All of this intercourse sexually with Wade Simmons occurred in Haskell County and the State of Texas. . . . When he failed to marry me on Christmas, then the date was set for the next summer to get married. He came out here I said about the first of January, and that he had intercourse with me in the next March after that time, and the first time that he had intercourse with me was when we were upstairs at home. At that time my sisters were downstairs and so was my brother, and I suppose my father was there too. I suppose that my aunt was also down there. I don't know where any one of them were, but I suppose that they were down there. I don't know what part of the night this was, but I suppose that it was in the fore part of the night. Before having intercourse there that night me and Wade had not been out any where. There ought to have been two rooms upstairs, but there is just one; there was just one great long room clean across the house. We did not receive company up there in that room. At that time me and Wade went up there to go out on the gallery, and we stayed out there a part of the time. We did not have intercourse out on the gallery but in the house. There was no bed in there. I don't know what all Wade told me then at that time. He asked me to have intercourse with him. At that time he said that we were going to marry, you know, in August, and if anything should happen, why, I believed that, of course. I did not state a while ago that I didn't believe what he said. You know what I mean, sir. I didn't believe him when he commenced to tell me all he would do if I should happen to get in trouble. He said that I should become pregnant that he would marry me; he said that if anything happened that he would not let that interfere with our engagement. He said that we would marry then if anything happened; that if anything happened that we would marry, but would marry in August anyway. At first I opposed having sexual intercourse with him, and the reason I opposed it was I was afraid that I would become pregnant; that was not the only reason, of course, I had lots of reasons, but that was my main reason. I don't know how many times Wade Simmons and I had intercourse in this county, but it was quite frequently."

In regard to the marriage, the father of prosecutrix testified, as follows: "On the first-Sunday after he came out here, I don't now remember positively,—just a day or two,—any way it was on the first Sunday that he was here. On that Sunday morning me and him walked out down below Logan's barn, and he told me that they had agreed to marry,—him and Bessie, and he had come after her and wanted to carry her back home, and I told him that I could'nt do that: that I couldn't agree to that. I says, 'You ought to have said something about that sooner. The way it is here, she is the oldest child and the only housekeeper I have got here, and under the

circumstances I couldn't do that.' I said, 'I haven't got anything against you, but under the circumstances I couldn't agree to that. You'll have to put that off, for I can't consent to that, or make other arrangements.' "

Logan testified to some conversation that he states occurred between himself and the father of prosecutrix, and Jim Simmons, brother of appellant, in which it was sought to corroborate the State's case by showing offers on the part of Jim Simmons to settle the matter by payment of money about the time of the institution of the prosecution. Logan was quite busy in trying to secure the payment of money on the part of either Jim Simmons or appellant or both to old man James, father of prosecutrix, as a means of avoiding prosecution. These matters were denied by the witness Jim Simomns, so far as his offering any money or agreeing to offer any money is concerned. His statement was, in substance, that these parties offered to take money, which he emphatically declined to give. Through this witness Logan they also introduced the statement of appellant in the general nature of an admission to the effect that he reckoned the child was his, but he would prove that others had also been intimate with her. The State also proved through the witness Jim Simmons that appellant had admitted to him that he had had intercourse with prosecutrix in McLennan County before her removal from that county to Haskell County, but further stated appellant had never admitted to him that he had intercourse with her in Haskell County. This is a sufficient statement of the State's side of the case. Appellant did not testify. By several witnesses appellant proved the general bad reputation of prosecutrix for chastity and virtue in McLennan County. Evidence was also introduced, which the prosecutrix admitted to be true, and as her father did, that he and prosecutrix, and another daughter had attended a Bohemian dance. It was considered disreputable for ladies to attend Bohemian dances. One of the witnesses said that he thought the attendance upon these Bohemian dances by American girls meant that they were bad characters. The witnesses who testified to the bad reputation of the girl were men and women. Mrs. Shipp testified that she and prosecutrix picked cotton together for a couple of months, and they talked a great deal. On one occasion she said they were talking about dancing, and the witness said that she did not feel very well that day. Prosecutrix replied that she ought to feel well; that if she just felt as bad as she, prosecutrix, did, she would feel bad, and began telling witness her troubles. Among other things, prosecutrix said that she had done wrong and very wrong. The witness asked her with whom. She stated Jess Honey. This occurred in the month of October, and that her monthly period had not appeared that month, and that she was very much troubled about it. The witness asked her her intentions in regard to the matter, and she replied her intentions were to marry Jess Honey; that she was then

pregnant. She did not marry Honey. He married another girl on the 5th of November after this conversation in October. About the middle of November this witness had another conversation with prosecutrix. When this conversation occurred prosecutrix was sick in bed. The witness called to see her and to make inquiry as to how she was getting along. Prosecutrix replied, "All right, everything had passed off, and she was getting along all right; she said that she had miscarried. Those were the very words she said." This witness loaned prosecutrix a dress for the purpose of marrying Honey; that she brought it back the next day and stated that it did not fit her, and asked witness if she would make a dress for her. Witness promised her she would do so. On another occasion this witness saw prosecutrix at her brother's house at a dancing party. That prosecutrix left the dancing room, went into another room and sat on the door-step; a young man by the name of Elias Earls sit down by her. Directly they got up and went away, but subsequently returned to the dancing room; that she did not know how long they had been gone, but when she did return, witness asked her what she meant by acting in a way unbecoming a lady. Prosecutrix "only laughed."

Honey testified that he had been engaged to the girl (prosecutrix) and engaged himself to her the first time he had ever gone with her, and that he had intercourse with her in a buggy while driving about 9 or 10 o'clock at night, and that while they were so engaged another buggy drove upon them driven by a young man named Blanchet, who was accompanied by a young lady. That he had intercourse with prosecutrix twice, the second time being behind the kitchen door at her home. It may be stated here that the prosecutrix admits in her testimony that she became engaged to Honey on the first time they went together, but denied the act of intercourse. Arthur Martin also testified that he had intercourse with her on a buggy drive. The testimony is rather voluminous, but this is about the substance of it.

Quite a number of exceptions were reserved to the charge as well as to the refusal of the court to give requested instructions. The record contains twenty-three bills of exception in addition to the exceptions to the charge reserved in the motion for a new trial.

After giving the general definition of the offense, the court applies the law, in a general way, to the facts, and instructs also that prosecutrix was an accomplice, and submits the question as to whether or not Logan and the father of prosecutrix were accomplices. Section 12 of the charge is as follows: "If you believe from the evidence in this case that the witness Bessie James had intercourse with another, or others than the defendant in this case (if you believe she had intercourse with the defendant, relying upon his promise to marry her), and prior to such intercourse with the defendant, or if you have a reasonable doubt as to whether she did or not, you

will find the defendant not guilty." The court further instructed the jury if they should find defendant guilty, but had a reasonable doubt as to whether or not it occurred in Haskell County, they should acquit. Exceptions were reserved to subdivision 12 of the charge for various reasons. Among others, that it omitted to instruct the jury that even if appellant had intercourse with prosecutrix in McLennan County before coming to Haskell County, that they should acquit. This phase of the charge is a little vague at that point, and should have been more specific.

Appellant requested the following instruction, which was refused: "You are charged that before you can convict the defendant, you must believe beyond a reasonable doubt, that defendant seduced the prosecuting witness in Haskell County, and that at that time she, the said Bessie James, was a chaste woman, who had never had sexual intercourse with any one, and unless you believe beyond reasonable doubt, that said Bessie James had never had such sexual intercourse with any one, prior to the time she had such intercourse, if any, with defendant in Haskell County, you must find the defendant not guilty."

The following instructions were also asked and refused: "You are charged that before you can convict the defendant, you must believe beyond reasonable doubt that the prosecuting witness, Bessie James, submitted to the embraces of the defendant and had carnal intercourse with the defendant while she was chaste and in Haskell County, Texas, and while she was relying solely and wholly upon an unconditional promise on the part of defendant to marry her, and even though you may believe that defendant had carnal intercourse with said Bessie James in Haskell County, and even though you may also believe that defendant promised to marry said Bessie James, if at the time of such intercourse, if any, between defendant and said Bessie James in Haskell County, the said Bessie James was (1) unchaste, that is, if she had previously had carnal intercourse with any one, or (2) if said Bessie James was actuated either in whole or in part by lust or passion, or any such consideration or motive, or (3) if any such promise of marriage by defendant was conditioned upon the said Bessie James becoming pregnant from such intercourse, or if you have a reasonable doubt that said Bessie James may have been chaste as aforesaid, or may have been actuated by any such motive as aforesaid or that such promise of marriage, if any, may have been so actuated, in any such event, you will find the defendant not guilty." Another special instruction was asked submitting to the jury the idea that they could not convict unless prosecutrix relied upon an unconditional promise of defendant to marry her although he may have had intercourse with her under such promise in Haskell County, which was refused. He also asked another special charge, which was refused, tersely putting the question that if such promise of marriage by defendant, if any, was made, it was conditioned upon

the said Bessie James becoming pregnant from such intercourse, or
if there was a reasonable doubt of that fact, they should acquit. In
several forms and under several instructions appellant requested the
court to charge the jury that before defendant could be convicted
they must find that Bessie James was a chaste and virtuous woman
prior to March 1, 1906, date of the alleged seduction. Appellant
also asked a special charge to the effect that under the laws of Texas
an unchaste woman could not be seduced, and if Bessie James was
unchaste at the time of the alleged seduction, they would acquit.
Without going into any further detailed statement of the special
charges, objections, etc., we are of opinion that the court's charge
was not sufficient, and did not properly present the issues to the
jury under the facts of the case, and the refusal of these special
charges was error. Under our statute (1) an unchaste woman can
not be seduced; (2) that in order to be seduced she must be led away
from the path of virtue; (3) by the promise of marriage; (4) that
the carnal intercourse must occur by virtue of the promise of mar-
riage. In the case of Putman v. State, 29 Texas Crim. App., 454,
this statute was under discussion; that is, article 814 of the Penal
Code which defines seduction as follows: "If any person, by promise
to marry, shall seduce an unmarried female under the age of twenty-
five years, and shall have carnal knowledge of such female, he shall
be punished," etc. Article 815 of the Penal Code is as follows:
"The term 'seduction' is used in the sense in which it is commonly
understood." Mr. Webster defines "seduction" to be "the act of
seducing or of enticing from the path of duty; specifically the act
or crime of persuading a female to surrender her chastity. 2. That
which seduces or is adapted or employed to seduce; means of leading
astray," etc. Judge White, delivering the opinion of the court in
that case, said: " 'Seduction,' then, implies that the female is led
away from the paths of rectitude and virtue, and induced to indulge
in carnal intercourse by the means used. 'Generally, in order to es-
tablish the charge of seduction it must be made to appear that the
intercourse was accomplished by some artifice or deception; and
it is held that something more than a mere appeal to the lust or
passion of the woman must be shown before the law will inflict
the penalty prescribed for that crime.' " See State v. Fitzgerald, 63
Iowa, 268.

"Mr. Bishop, in his work upon Statutory Crimes, p. 638, second
edition, says: " 'Though the parties are already under marriage en-
gagement, if the woman yields, not by reason of the man's promise
of marriage, but simply for the gratification of a criminal desire, he
does not commit the offense, yet the subsistence of the engagement
does not render his act less a crime if she submits from reliance
thereon.' " In 58 Ga., 328, Judge Bleckley of the Supreme Court of
that State, said: "To make love to a woman, woo her, make hon-

orable proposals of marriage, have them accepted, and afterward undo
her under a solemn repetition of the engagement vow, is to employ
persuasion as well as promise of marriage." Judge Sherwood of the
Supreme Court of Missouri, speaking for that court, uses this lan-
guage: "There are two steps necessary to be taken in order to con-
summate the crime under discussion. First, the female must be se-
duced—that is, corrupted, deceived, drawn aside from the path of
virtue which she was pursuing; her affections must be gained, her
mind and thoughts polluted; and, second, in order to complete the
offense, she must be debauched—that is, she must be carnally known
before the guilty agent becomes answerable to human laws." Judge
White again, in the Putman case, supra, approvingly quotes the fol-
lowing from the case of State v. Reeves, 97 Mo., 668: "No one can
with any degree of plausibility contend that a virtuous female could
be seduced without any of those arts, wiles, and blandishments so
necessary to win the hearts of the weaker sex. To say that such a
one was seduced by simply a blunt offer of wedlock in future in
exchange for sexual favors in praesenti, is an announcement that
smacks too much of bargain and barter and not enough of betrayal.
'Tis hire or salary, not seduction." In State v. Patterson, 88 Mo.,
88, same case 57 Am. Rep., 374, it was in substance held that
the word "seduce" implies, ex vi termini, chastity as a condition
precedent on which the act of seduction is to operate, resulting in
the end in debauchment, the physical deprivation of chastity, as the
consummation of the crime of seduction. In the case of Bailey v.
O'Bannon, 28 Mo. App., 39, it was held "seduce" means to deceive,
to corrupt, and to draw aside from the path of virtue one who, at
the time she is approached is honestly pursuing that path; and seduc-
tion can only operate on one previously chaste. In Commonwealth v.
Hadfield (Pa.), 3 Kulp, 121, it was said that to seduce is to induce
to surrender chastity; but an unchaste woman has no chastity to
surrender, and therefore can not be seduced. It was said in State v.
Wheeler, 108 Mo., 658, that every illicit connection is not a
seduction. It can not be said that a female is drawn aside from
the path of virtue unless she is honestly pursuing that path when
polluted. If her mind is corrupt and polluted with lewd thoughts,
and she is ready to submit to improper embraces, as opportunity offers,
from her own lustful propensity and without any arts or blandish-
ments of him with whom she has had sexual intercourse, she can not
be said to be seduced by the party with whom she has improper sexual
relations. To the same effect is Franklin v. McCorkle, 84 Tenn., 609;
Com. v. McCarty (Pa.), 2 Clark, 351. In Norton v. State, 72 Miss.,
128, 49 Am. St. Rep., 538, it was stated that on a prosecution for
seduction under promise of marriage, the chastity of the woman at
the time of the intercourse must be proved; for there must be a
leading aside from the path of virtue to constitute the offense. See
also Hill v. Wilson (Ind.), 8 Blackf., 123; Patterson v. Hayden,

17 Or., 238; same case, 3 L. R. A., 529, 11 Am. St. Rep., 822; Marshall v. Taylor, 32 Pac., 867; People v. Clark, 33 Mich., 112; State v. Hamann, 80 N. W., 1064; 109 Iowa, 646; Boyce v. People, 55 N. Y., 644. It was held in People v. Duryea, 9 N. Y. Cr. Rep., 402; 30 N. Y. Supp., 877, that "One who induces a woman to have sexual intercourse by promising that, if she becomes pregnant, he will marry her, is not guilty of seduction on a promise of marriage, as the promise is conditioned on an event which may never occur." We deem it unnecessary to follow the authorities further. If the girl was unchaste, as testified by defendant's witnesses prior to appellant having intercourse with her, even if under promise of marriage, still he would not be guilty under article 814 of our Penal Code. If she had had intercourse with several parties in McLennan County before going to Haskell County, she would be unchaste. If she had been pregnant as testified by one of the witnesses, Mrs. Shipp, in McLennan County, and had a miscarriage, she would not be chaste. If she simply agreed to have carnal intercourse with appellant under a conditional promise of marriage, the condition to happen in the future, predicated upon a possible or probable pregnancy, this would not be seduction. Under the testimony of the prosecutrix the question is squarely raised that she submitted to his importunities because of his promise to marry her if anything got wrong and she became pregnant. This promise was conditioned on an event which might never occur, and as said in the Putman case, supra, it is more in the nature of a contract or bargain and barter than one of betrayal of confidence. See also Garlas v. State, 48 Texas Crim. Rep., 449; Gorzell v. State, 43 Texas Crim. Rep., 82; Mrous v. State, 31 Texas Crim. Rep., 597; Kelly v. State, 33 Texas Crim. Rep., 31; Merrell v. State, 42 Texas Crim. Rep., 19; Spenrath v. State, 48 S. W. Rep., 192.

We are of opinion, therefore, that the court's charge was not sufficient and did not embrace the legal propositions involved in the special instructions and which are directly applicable to the facts adduced on the trial. We have not discussed the testimony which the State introduced through the witness Jim Simmons to the effect that appellant admitted having intercourse with the girl in McLennan County. Under that state of case, the seduction could not have occurred in Haskell County. Upon another trial the substance of the special instructions and the legal propositions involved therein should be given in charge to the jury. We do not intend to convey any conclusion on the facts further than as applicable to charges.

Because of the failure of the court to give the propositions announced in the special charges, and the refusal to give them when requested by appellant, the judgment is reversed and the cause is remanded.

*Reversed and remanded*

RAMSEY, JUDGE.—I agree to the conclusion only. I do not agree to nor do I approve of the language used in many of the cases quoted.