BOB NASH v. THE STATE.

No. 459. Decided January 25, 1911.

Rehearing Denied February 22, 1911.

**1.—Seduction—Circumstantial Evidence—Rule in Cases of Seduction.**

The evidence in a seduction case, to support a conviction, is to be measured and governed by the rules of any other crime, and any rule that would require a departure from the ordinary rules of testing the sufficiency of the evidence or the amount of proof required, unless prescribed by the statute, would be out

of harmony with the spirit of the criminal law; and the crime of seduction may be established by circumstantial evidence as well as direct.

### 2.—Same—Accomplice—Corroboration—Promise of Marriage—Intercourse.

The crime of seduction is governed by the same rule which is applicable to other cases with reference to the corroboration of accomplice testimony; and it is not required that the prosecutrix shall be corroborated, as to the promise of marriage and intercourse by the same character of proof as the accomplice testimony; but the law simply requires that her testimony shall be corroborated by facts and circumstances tending to show that the defendant committed the offense, and that her testimony is true. Following Williams v. State, 59 Texas Crim. Rep., 347; 128 S. W. Rep., 1121. Qualifying Spenrath v. State, 48 S. W. Rep., 192, and other cases.

### 3.—Same—Case Stated—Sufficiency of Corroboration.

Where, upon trial of seduction, the prosecutrix testified to the intercourse and the promise of marriage, and the circumstances of corroboration showed that the defendant was the only man who was shown affirmatively to have kept her company within the period of nine months prior to the birth of her child, with one exception, and this man was with her at a time that would render it impossible for him to be the father of the child, and that defendant had almost the exclusive opportunity to commit the offence, and that he fled as soon as the prosecutrix's pregnant condition was known, etc., the corroboration was sufficient to sustain the conviction. Davidson, Presiding Judge, dissenting.

### 4.—Same—Charge of Court.

Where, upon trial of seduction the court properly submitted the issues arising from the evidence to the jury, there was no reversible error.

Appeal from the District Court of Lamar. Tried below before the Hon. Ben H. Denton.

Appeal from a conviction of seduction; penalty, four years imprisonment in the penitentiary.

The opinion states the case.

*Allen & Dohoney*, for appellant.—The word "seduced" is not used in the applying portion of the charge, nor is its definition anywhere referred to, and the jury is not required to find the existence of the essential elements of the crime of seduction before they can convict. Marshall v. State, 40 Texas, 200; Davis v. State, 10 Texas Crim. App., 31; Francis v. State, 7 Texas Crim. App., 501; Moore v. State, 15 Texas Crim. App., 1.

The evidence is insufficient to sustain a conviction; that of prosecutrix, which is the only criminative evidence in the record, does not prove seduction, but only shows that defendant had intercourse with her to which she consented under consideration of a promise of marriage; that she consented to the intercourse the first time it was proposed, and does not show any employment of the arts, wiles and blandishments that constitute the gravamen of the offense. Putnam v. State, 29 Texas Crim. App., 454; Wisdom v. State, 45 Texas Crim. Rep., 215, 75 S. W. Rep., 22; Simmons v. State, 55 Texas Crim. Rep., 441, 114 S. W. Rep., 841.

There is no evidence in the record that corroborates the testimony of prosecutrix, neither as to the alleged act of intercourse nor as to

the promise of marriage; and no evidence, other than the statements of prosecutrix, that proves or tends to prove a crime, or appellant's connection therewith. Nolan v. State, 48 Texas Crim. Rep., 436, 88 S. W. Rep., 243; Fine v. State, 45 Texas Crim. Rep., 290, 77 S. W. Rep., 807; Welden v. State, 10 Texas Crim. App., 400; State v. Wisdom, 45 Texas Crim. Rep., 215, 75 S. W. Rep., 22; Barnard v. State, 76 S. W. Rep., 475.

The evidence relied upon by the State is not of that character required by the law to be sufficient as corroboration. It is not criminative inherently, is not inculpatory, and does not tend in any degree to connect appellant with the commission of the offense testified to by prosecutrix. The matters established by the evidence relied on by the State as corroboration go to relations that are innocent in themselves and entirely proper insofar as they bear on the case. Harper v. State, 11 Texas Crim. App., 1; Cohea v. State, 11 Texas Crim. App., 622; Welden v. State, 10 Texas Crim. App., 400; Jones v. State, 7 Texas Crim. App., 457; Dunn v. State, 15 Texas Crim. App., 560.

*John A. Mobley* (then Assistant Attorney-General), and *R. L. Lattimore,* District Attorney, filed a brief for the State, on rehearing, citing: Williams v. State, 59 Texas Crim. Rep., 347, 128 S. W. Rep., 1121; Wright v. State, 47 Texas Crim. Rep., 433; 1 Ency. of Law, p. 583; Faulkner v. State, 53 Texas Crim. Rep., 258, 109 S. W. Rep., 199; Bales v. State, 44 S. W. Rep., 517; Criner v. State, 53 Texas Crim. Rep., 174; Jackson v. State, 40 S. W. Rep., 998; Meyers v. State, 7 Texas Crim. App., 640.

*C. E. Lane,* Assistant Attorney-General, for the State.

DAVIDSON, PRESIDING JUDGE.—This conviction was for seduction, the punishment assessed being four years confinement in the penitentiary.

The alleged seduced female testified that appellant had sexual intercourse with her on account of a promise to marry; that this occurred about the last of June or first of July; that she submitted to appellant because he promised to marry her, and she thought him true; that she loved him, and thought he would fulfill his promise; that appellant told her he would marry her if she submitted. A child was born on the 15th day of the following March. The parties were about the same age. Coming down to the particular facts of the first intercourse, she said it occurred out by the garden at night after they had returned from an ice cream supper, a distance of about six miles from where the act occurred. The prosecutrix says she came back from the supper in a wagon in company with several other people; that she got out of the wagon at the big gate just in front of the house; that when she got out of the wagon appel-

lant asked her if she would meet him out by the garden. She further testified: "After we got to the house he asked me if I would not come out there and talk to him. I was fixing to go to town the next morning, and he asked me if I would, and I did not want to go, and he insisted on my coming, and begged me to come, and I went. When we got to the door he said he wanted to talk to me, and asked me if I would go with him out there. He said he would wait for me, and I went in the house and put up my fan and my handkerchief and some things, and went in and turned the cover down on my bed. The reason I went in the house, I knew they were all awake, and I went in there and slipped out. I didn't want them to know I left the room at all. I pulled off my shoes and went out in my stocking feet. I did not change any of my clothes, and did not take off any of my clothes. When I came out he was out by the side of the garden waiting for me, and he asked me to sit down, and I sat down and we talked on awhile, and he asked me to submit to him, and he promised to marry me. I don't know that I can remember just every word he said to me, but he asked me if I still loved him, and I told him yes, and he asked me to submit, and I would not do it, and he said, well, you know I would not harm a hair on your head; he says, you know I would not betray you; he says, you know I would not harm you for anything on earth; he just asked me if I would let him have it, and I didn't want to at first, and he kept insisting and I finally agreed. I asked him what would he do; I says, people will be finding this out; he says, no, they won't never know anything about it; he says, we mean to get married and we will get married before anybody knows anything about it; he says, there will be no harm done for nobody knows it. I says, 'Well, maybe not.' I suppose that was somewhere between 10 and 11 o'clock. I did not have any feeling or desire for sexual intercourse right at the time that I consented, and did not have any desire for it before I consented. He had his arms around me while we were sitting down. I put my arms around him, and he put his arms around me. We sat there in that position but a very few minutes. He had not said anything to me along that line on the way home; there was no opportunity; there were others in the wagon. We were sitting by the side of one another in the wagon, but we did not have our arms around one another. It was not a very light night, but the moon was shining some. When we got to the door we talked a few minutes, and he asked me if I would meet him out there; said he wanted to talk to me awhile. I went in the house first, because I knew they were all awake and knew they would all get up, and I knew better than to go out there just as I was, and I went in the house and made like I was going to bed, and I pulled off my shoes, turned down my bed, and slipped out. I had no idea what he wanted me to go out there for except what he said. He had hugged me before that time, and I had hugged him several different times. I

had sat in his lap. He had not gone with me so often before that happened for some little bit; we had had a falling out, and we had just made. up, I believe, on Monday night before that, and that was on Saturday night."

There is testimony by this witness of two other acts between the parties at intervals of four weeks which occurred under similar circumstances to those already testified. There is evidence that a complaint was filed against appellant some months after this intercourse, and that he left the country and was gone awhile, but was finally arrested. There is evidence to the effect that appellant and prosecutrix were together in public quite a number of times, going to prayer meetings and social occasions, and there is also evidence that she went with other young men occasionally. All the witnesses or nearly all of them testified to the good reputation of both prosecutrix and appellant, and that they were young people, about the same age, the prosecutrix a little older than appellant. There is no further evidence than that detailed in regard to the promise of marriage, nor is there any evidence other than that of the prosecutrix that appellant ever had intercourse with her except on one occasion where he, appellant, and one of his friends were in town, and the friend said something to appellant in regard to purchasing a toy for his boy, the evidence showing that prosecutrix gave birth to a male child. It may be conceded as a fact not to be controverted that prosecutrix had intercourse with some man. This is the only way to account for the birth of the child.

In order to constitute the crime of seduction, there must be a seducing or leading away of the girl from the path of virtue; the intercourse had with the seducer; the promise of marriage. The alleged seduced female must be corroborated in essential elements of the alleged offense. We are of opinion the evidence does not show that the prosecutrix was corroborated as the law requires. It further appears from the testimony of the prosecutrix that while they had been sweethearts for a couple of years, they had had a "falling out," and had only made friends on the Monday night previous to the alleged intercourse. She does not state there had been an agreement to marry prior to the night of the first act of intercourse. This is to be assumed, if at all, from the fact that they had been sweethearts before that time, but had broken off their friendly relations. So far as any positive evidence on her part is ,concerned, the first promise of marriage was made out by the garden after she had gone out of the house to meet him at the designated and agreed point. We are, therefore, of opinion that under the facts stated the evidence does not justify the conviction. There is not sufficient corroboration of the prosecutrix as contemplated by the statutory definition of the offense of seduction and the decisions in this State. Putnam v. State, 29 Texas Crim. App., 454; Wisdom v. State, 45 Texas Crim. Rep.,

215, 75 S. W. Rep., 22; Simmons v. State, 55 Texas Crim. Rep., 441, 114 S. W. Rep., 844.

The judgment is therefore reversed and the cause is remanded.

*Reversed and remanded.*

RAMSEY, Judge (dissenting).—In that invaluable repository of the common law, Coke's Commentaries on Littleton, that doughty old knight of the law observes (Lib. 3, sec. 378), that "By reasoning and debating of grave learned men the darknesse of ignorance is expelled, and by the light of legal reason the right is discerned, and thereupon judgment given according to law, which is the perfection of reason. This is of Littleton here called *legitima ratio,* whereunto no man can attaine but by long studie, often conference, long experience, and continual observation. Certaine it is, that in matters of difficultie the more seriously they are debated and argued, the more truely they are resolved, and thereby new inventions justly avoided."

We, in this case, seem not to have justified the remarks of the learned author. On the contrary, the more we have consulted about the case, and these consultations have been both frequent and prolonged, the more widely apart have we drifted. The case has now been with us so long that a further delay in disposing of it would be injustice alike to appellant and to the State, and so we find ourselves at the parting of the ways, and since I can not agree with my brethren or go with them, it must result as it did with Lot and Abraham, in the days of the patriarch, that we shall "separate ourselves the one from the other," the majority speaking for the court and registering its decree while I am left in the solitary and inhospitable domain of dissent. I recognize that no dissenting opinion can ever justify itself unless it is right. That even then it is most unavailing unless it has the effect to arrest attention, excite inquiry, provoke discussion, and ultimately lead to the ascertainment of the truth. As to whether I am right in my conclusions, both as to the law and the facts of the case, indeed, as to whether I am right on either the law or the facts will be determined by a generous profession of this and other times, and to this judgment, always in the long run both fair and just, I shall make my appeal. I trust, too, that, however lacking in strength and vigor the opinion may be, that it will arrest attention, excite inquiry, provoke discussion, and lead the court back some time to what I conceive to be the ancient and settled truths of the law. I am not unmindful of the respect and confidence with which the judgment of my associates will be received. My own respect and esteem for them would and should, indeed, constrain and withhold this opinion except for the certainty I feel that I am right. This opinion so entertained by me results after weeks and months of examination and reexamination and all the study I can give to any case. With the views thus entertained I should feel that I had committed treason to my own convictions, and worse than

treason to the law which I not only love, but am sworn to support and uphold, if I did not dissent.

From my point of view, the conclusion of the majority is not only erroneous, but the result, as I view the result, is most unfortunate, not to say deplorable. It is a judgment and conclusion which I fear must greatly weaken the laws of this State designed to protect the innocence and virtue of our women and punish those who, under promise of marriage, would despoil them. The opinion of the majority concedes that no evidence was improperly admitted for the State, and that none properly receivable in appellant's behalf was denied him. The opinion concedes that the learned trial court submitted the law, and all the law of this State, in charge to the jury. The opinion is based on the sole proposition that, as a matter of law, under the facts the conviction is without warrant, and decrees, in substance, that appellant must go free. Again to this conclusion I enter my dissent, and shall undertake to give at as much length as may seem necessary the reasons upon which that dissent is bottomed.

It will be conceded, I am sure, by my associates that the laws of this State which make for the protection of the home should be upheld in all their vigor. Any interpretation of our laws, not in fairness demanded, which would undermine and sap the strength of the law which safeguards the home and its dearest and most important interests, would be worse than the "pestilence that walketh in darkness, or the destruction that wasteth at noon day." They must recognize, as I do, the truth of the counsel which Laertes gave to Ophelia that:

> "The chariest maid is prodigal enough,
> If she unmask her beauty to the moon."

And while I recognize that we may not and can not wholly, in the decisions of this court, instil in the minds of our people those lessons of purity learned at the fireside and strengthened by religious teaching, still in supplement of these, we can and ought to so administer the law according to its true intent and purport without injustice to any man as to throw proper protection around those whose inexperience and attractiveness point them out as victims of the libertine.

Katie Weddle was a young woman living in the vicinity where appellant resided. Neither her father nor her mother were living. In the spring of 1904, when she first became acquainted with appellant, she was living at his brother's, Will Nash. She and appellant had been sweethearts for about two years, and during all that time she was his companion, and he waited on her. The first act of carnal intercourse, according to her testimony, was had on the last day of June or first of July, 1906. She states: "I submitted to him because he had promised to marry me, and I thought him true and I loved him, and I thought he would fulfill his promise. He told me

that he would marry me if I submitted to him." She further testi-
fies that there were two other acts of intercourse. The second act
occurred four weeks from the first; she says that at this time Minnie
Nash, appellant's sister, came to town after her in a buggy, and that
she went down to Mr. Nash's, the father of appellant, and stayed
there Saturday night and Sunday night. That they went to Mt.
Olive to prayer-meeting, and that the act of intercourse took place
as they were coming back home. The details need not be here set
out. The third act of intercourse occurred on the occasion of appel-
lant's taking prosecutrix to church, where they went in a wagon
most of the way with appellant's mother and sister and·some of
the rest of the relatives. It developed as a result of the intercourse
that a child—a boy—was born on the 15th day of March, 1907.
Soon after this an affidavit was filed against appellant charging him
with the offense of seduction, and he fled the country, and remained
away about a year. During this time the sheriff of Delta County
made a search for him without being able to find him. Numerous
witnesses were introduced, all of whom testified that the reputation
of Miss Weddle as a chaste and virtuous woman was good. They
all testified that the relations between appellant and Katie Weddle
were intimate and their association frequent. Mrs. Hughley says:
"After appellant started there was not any other one kept her com-
pany until after I left there; I don't think I ever saw anyone else
with her but Bob. They would go out in society and places of enter-
tainment and church and things of that kind." George Willis says
that during the time appellant associated with her, which covered a
period of a year or such matter, and while he was keeping her com-
pany he does not recollect but one other boy keeping her company,
and that he went home with her one night from prayer-meeting, and
that was Ezell Scott; but appellant was with her constantly at enter-
tainments, church and things of that kind; that appellant would be
with her nearly every time witness would be at an entertainment or
at church or anywhere. Frank Hearne testified that appellant had
waited on Miss Weddle something like two years; that he would see
them together at many different places, parties, preaching and Sun-
day-school, and entertainments of all kinds, such as were in the
country. Mrs. Hearne testified that appellant went with Miss Weddle
something like two years, and that during this time he was keeping
her company she did not remember ever seeing any other young man
with her unless it was Ezell Scott; that she would see appellant and
Miss Weddle together at church, entertainments and Sunday-school,
and places of that kind. Ed Elliott testified that appellant kept com-
pany with Miss Weddle something like a year or two, and that while
he was keeping her company witness did not know of anyone else
going with her; that he would see them at different places together—
at Sunday-school, prayer-meeting and parties; that he remembered in
the summer of 1906, when a complaint was made against appellant

for seduction; that he remembered about the time when Miss Weddle gave birth to a child; that he saw appellant in town one day before this and they were talking together about a little baseball mitt and shoulder, and something was said that he ought to get that for his boy, or something like that was said. He further testified: "I don't remember exactly how it was, but it was something to that amount." On cross-examination touching this matter, he testified: "I was 'joshing' him about the baby, and there was something said about the mitt; I think I brought it up myself. I might have been the one that suggested that he buy one for his boy; I won't be certain; we was talking, and he said yes, he ought to buy it." A number of other witnesses testified to the intimate association between appellant and Miss Weddle, and, without exception, they all stated that her reputation was that of a good, chaste and virtuous girl, and most of the witnesses testified that appellant's reputation as a law-abiding citizen was good. Charley Cawley testified that he saw appellant and Miss Weddle together during the summer of 1906, and that during this time he was the only one that witness knew of that kept her company; that witness remembered when she came to town and stayed awhile, and when she went back out in the country, and appellant was still going with her after she came back out in the country. There is some little evidence that for a month or two before the act of intercourse there had been some cessation of appellant's attentions, but these were renewed something like a week or ten days before the act of intercourse. The only attempt to contradict Miss Weddle was by a witness who testified that prosecutrix said to the witness during the year (time not given) that if she could not get Bob Nash one way she would another. That this was before she went to Paris. This was denied by prosecutrix. This witness testified that during all the time that she knew the parties that only one other person had gone with Miss Weddle, and that he went with her one time, and that during the summer months of 1906 —June and July, and throughout the summer—appellant and the young lady were together frequently. The testimony of the prosecutrix to the intercourse, to her age, and to the promise of marriage, and her reliance thereon, and indeed to all the essentials of the offense, is clear, positive and convincing.

The only question raised on these facts is as to whether the corroboration is sufficient as to the promise of marriage and the intercourse, and the opinion of the majority can only be justified and sustained on the ground that the corroboration by the testimony of other witnesses is indispensable in respect to the promise of marriage and the act of intercourse, and that this being true, the evidence of corroboration in respect to these matters is not sufficient. In determining the sufficiency of the evidence on appeal, we must assume as true not only every fact distinctly proven, but those inferences and conclusions of fact which in fairness the jury could draw from facts directly and positively established. It can no longer be doubted that it is the law that both the

act of intercourse and the promise of marriage can be established by circumstantial evidence. No lawyer can, as I conceive, give any reason why the law of circumstantial evidence should not apply in cases of seduction as well as in cases of murder or theft. In the case of Beeson v. State, 60 Texas Crim. Rep., 39, 130 S. W. Rep., 1006, the court below instructed the jury, among other things, as follows: "You are, however, instructed that corroborative evidence need not be direct and positive, independent of the prosecutrix Miss Edna Blackshear, but such facts and circumstances as tend to support her testimony, and which satisfy the jury that she is worthy of credit as to the facts essential to constitute the offense of seduction as hereinbefore defined to you, will fulfill the requirements of the law as to corroboration, and it is for you to say from all the facts and circumstances in evidence before you whether she has been sufficiently corroborated." This instruction was sustained and held correct in a very able opinion by Judge Cobb, sitting as special judge with Presiding Judge Davidson and myself, Judge McCord not sitting, and is conclusive on the proposition that the evidence of corroboration may be circumstantial. That matter then may be considered as settled.

There are in our Code of Criminal Procedure two provisions in cases of seduction, touching the matter of corroboration of the testimony of the party wronged who, in the eyes of the law, is treated as an accomplice. Article 781, which is general in its character, is as follows: "A conviction can not be had upon the testimony of an accomplice, unless corroborated by other evidence tending to connect the defendant with the offense committed, and the corroboration is not sufficient if it merely shows the commission of the offense." Article 769 of the Code of Criminal Procedure, having special reference to the testimony of a woman seduced, is to this effect: "In prosecutions for seduction, under the provisions of the Penal Code, the female alleged to have been seduced shall be permitted to testify; but no conviction shall be had upon the testimony of the said female, unless the same is corroborated by other evidence tending to connect the defendant with the offense charged." I think it probable that the last-named article was intended to institute a somewhat different rule in seduction cases. This, however, may not be quite clear, and it is unnecessary to express a definite conclusion on it. Whether this construction is true or not, in my opinion, under either article the testimony is abundantly sufficient, and we are not justified under the evidence in concluding otherwise than that the testimony of this woman was corroborated, was confirmed, and was and is true. It is not required, I think, that the corroboration should extend to every essential element of the offense. Article 967 of our Penal Code, which defines seduction, is in this language: "If any person by promise of marriage shall seduce an unmarried female under the age of twenty-five years, and shall have carnal knowledge of such female, he shall be punished by imprisonment in the penitentiary not less than two nor more than five years, or by a

fine not exceeding five thousand dollars." This statute has been construed, and properly so, to apply only to a woman previously chaste. Therefore, in order to establish the crime of seduction, four things must be shown: First, that the person claimed to be seduced is an unmarried female under the age of twenty-five years; second, that she is chaste; third, that she submitted to carnal intercourse with the person charged, and fourth, that this intercourse was obtained by promise to marry upon which the prosecutrix relied. Now, while there are many loose expressions in the books to the effect, in substance, that the prosecutrix must be corroborated, both in respect to the act of intercourse and the promise of marriage, this is not the law, and never was the law. The statute no more requires corroboration in respect to the act of intercourse or to the promise of marriage than it does in respect to the age of prosecutrix, or to her previous chaste character. That it is not essential that corroboration shall exist in respect to every ingredient and essential of the offense was distinctly held by Judge McCord in one of the ablest in many of the excellent opinions rendered by him. In the case of Williams v. State, 59 Texas Crim. Rep., 347, 128 S. W. Rep., 1121, in language of admirable clearness, he thus disposes of the contention by appellant that there had been no corroboration in respect to one of the essential facts required to be shown, to wit, that the prosecutrix was under twenty-five years of age: "It is also contended that there is not sufficient corroboration in the case. It is admitted that the prosecutrix was corroborated on the question of promise of marriage and intercourse. She testified that she was eighteen years of age. It is insisted before this court that, because there was no testimony corroborating her upon this point, therefore the conviction can not stand. We do not agree to this contention. All crimes have in them different issues and different elements that are required to be proved in order to sustain a conviction. The statute is general that the accomplice must be corroborated by other testimony tending to connect the defendant with the commission of the offense. The statute does not say in what this corroboration shall consist. If the testimony other than that of the accomplice should make out a complete offense, it would not be necessary to use the accomplice's testimony. Hence the law wisely provided that the corroboration must tend to connect the defendant with the commission of the offense, and to require that every constituent element of the offense as sworn to by the accomplice must be corroborated would be requiring of the State an impossibility." This decision is in harmony with the law everywhere except as it has been interpreted in some of the expressions of this court. Among the clearest statements of the rule on this subject I have found is contained in the 1 Am. & Eng. Ency. of Law and Prac., p. 583, where it is said: "The testimony of the accomplice need not be corroborated on every material fact so that independent of his testimony a conviction would be authorized, as this would in effect deny to the testimony of an accomplice all value." Among other cases cited as supporting the

text are the cases of Myers v. State, 7 Texas Crim. App., 640; Nourse v. State, 2 Texas Crim. App., 304; Davis v. State, 2 Texas Crim. App., 588; Hoyle v. State, 4 Texas Crim. App., 239; Jones v. State, 4 Texas Crim. App., 529, and Wright v. State, 47 Texas Crim. Rep., 433. Looking to the decisions of the courts elsewhere, we find the following admirable statement in respect to a statute almost identical with our own. In the case of State v. Lawlor, 28 Minn., 216, the court said: "The statute respecting the use of the testimony of an accomplice is as follows: 'A conviction can not be had upon the testimony of an accomplice, unless he is corroborated by such other evidence as tends to convict the defendant of the commission of the offense; and the corroboration is not sufficient if it merely shows the commission of the offense or the circumstances thereof.' Gen. St. 1878, chap. 73, sec. 104. We think a reasonable construction of this section does not require a case to be made out against the prisoner sufficient for his conviction before the testimony of an accomplice can be considered, for that would make it available only when its necessity did not exist; neither do the terms used require such an interpretation. The corroborating evidence must, independently of the testimony of the accomplice, tend in some degree to establish the guilt of the accused, but need not be sufficiently weighty or full, as, standing alone, to justify a conviction. We have met with no case coming under the common law or statutory law in which full proof was required by way of corroborating evidence."

In the case of Myers v. State, 7 Texas Crim. App., 640, which is a murder case where the penalty of death was inflicted, and which was affirmed by this court, Judge Winkler, who delivered the opinion, said: "The authorities are not agreed as to the amount and extent of corroboration required in order to warrant a conviction on the testimony of an accomplice who, in the sense of a witness, is any direct participant in the crime, but with this we need have no concern, for the reason that the statute has settled it by declaring the extent of the corroboration necessary. It is 'other evidence tending to connect the defendant with the offense committed.' We do not understand that this requires that the different matters testified to by the accomplice are to be supported, each one, by the other testimony to the same isolated facts, but that it must tend to connect the defendant with the offense committed." In the more recent case of Criner v. State, 53 Texas Crim. Rep., 174, in which I wrote the opinion for the court, we said: "We have set out the testimony at this considerable length and have stated practically the testimony tending to connect appellant with the burglary. The rule is, of course, well settled, that before a conviction can be had upon the testimony of an accomplice that there must be other proof tending to connect the person charged with the commission of the offense. Just how strong in every case, this corroborating testimony shall be must depend to a large extent upon the facts of each particular case. We believe that while not strong, that it could

not in fairness be said that there was no corroborating testimony, or that it was so weak, indefinite or immaterial as to justify us in holding, in view of the verdict of the jury, that it was wholly lacking."

In the case of Cohea v. State, 11 Texas Crim. App., 622, in which Judge Hurt delivered the opinion, it is said: "As we have before held, the evidence of the other witnesses need not corroborate some particular fact testified to by the accomplice, but it must tend to establish the guilt of the defendant."

The rule announced in the case of Myers v. State, 7 Texas Crim. App., 640, is in harmony with the decisions of this court in the case of Jackson v. State, 4 Texas Crim. App., 292, and Hoyle v. State, 4 Texas Crim. App., 239, to the effect that it is not essential that the corroborative evidence should corroborate the accomplice testimony substantially and in detail. It has likewise been held that it is not essential that the corroborative evidence should suffice of itself to establish the guilt of the accused, and in that event it is said the testimony of the accomplice would not be needed. Nourse v. State, 2 Texas Crim. App., 304. In that case Judge Ector, speaking for the court, says:

"It will be seen that, to justify a conviction on the testimony of an accomplice, there must be some evidence which, of itself and without the testimony of the accomplice, tends in some degree to connect the accused with the commission of the crime. The Supreme Court of California (in the case of The People v. Melvane, 39 Cal., 614), say: 'The corroborative evidence may be slight and entitled to but little consideration; nevertheless, the requirements of the statute are fully fulfilled if there be any corroborating evidence which of itself tends to connect the accused with the commission of the offense.' This decision was rendered under a statute very similar to ours in regard to the corroboration necessary to be had to the testimony of an accomplice to support a conviction. Article 375 of the Code of California is as follows: 'A conviction can not be had upon the testimony of an accomplice unless he be corroborated by such other evidence as shall tend to connect the defendant with the commission of the offense, and the corroboration shall not be sufficient if it merely shows the commission of the offense or the circumstances thereof. It is a mistaken idea to suppose that the corroborating evidence must conclusively of itself connect the defendant with the commission of the offense. If so, there would be no use for the testimony of the accomplice.'"

One of the best, clearest and most lucid statements of the rule to be found in the books is that of Judge Simpkins in the case of Wright v. State, 31 Texas Crim. Rep., 354. This case, too, is particularly valuable since it was referred to with approval by Judge Cobb in his opinion in the case of Beeson v. State, supra, rendered not longer ago than the 22d day of June of the present year, will be seen by the above quotation from the Beeson opinion. There

Judge Simpkins says: "As to the sufficiency of the testimony, we think the witness is amply corroborated as to the promise of marriage and the illicit intercourse. Corroborative evidence need not be direct and positive, or such evidence as is sufficient to convict, independent of that of the prosecutrix, but simply such facts or circumstances as tend to support her testimony, and shall satisfy the jury she is worthy of credit. And when there is other testimony fairly tending to support the prosecutrix upon facts essential to constitute the offense, it is for the jury to say whether she is corroborated. The State v. Timmens, 4 Minn., 325 (Gil., 241). She testified she yielded to defendant because he faithfully promised to marry her. The witnesses prove that the young lady was highly esteemed, and visited by other young gentlemen, and moved in the best social circles, with a good reputation for chastity and virtue; that he was received by her family as a suitor, and was so persistent in his attentions that all other gentlemen were compelled to cease attendance. His letters breathe undying affection and strong jealousy, and speak of their marriage in the future as a certainty. We think the evidence is amply sufficient to sustain proof of seduction."

However, under any rule ever announced by this court, I think a careful study of the record must carry conviction that the testimony of corroboration is sufficient. Of course, in so applying the testimony we must have some reference to the nature of the case, the situation of the parties, their station in life, and the opportunities for securing testimony in corroboration of the prosecutrix. In so doing we should also have some regard to the character of the offense, the situation of the parties, and what we know, and what the jury and the trial court knew of human nature and the relation of the sexes. We should also remember that accomplices like angels differ not in glory, but in blame. In this case the prosecutrix is in law called an accomplice, and in a certain sense her testimony suffers the same legal disparagement as that of a burglar, a thief or an assassin who has turned State's evidence, and the law requires that before a conviction can be had on her testimony there must be evidence other than her own tending to connect appellant with the crime, and yet we know that many a woman who has fallen is, as to other men, wholly virtuous, and that many women who have gone astray under such circumstances as this young girl did, might, by evidences of deep contrition, thorough repentance, and other evidences of truthfulness, prove as convincing in her testimony as that of any witness whose hand was ever lifted in a courthouse. To the jury hearing this case, and to the court sitting on the bench as a just arbiter between the State and the defendant this case was committed (subject only to the provision of law that there must be other evidence tending to connect appellant with the crime charged), and the weight to be given to her testimony was for them to determine. It may well be that her demeanor on the stand shadowed forth such

clear-eyed and white-souled truthfulness as that they were so thoroughly convinced and so deeply impressed that to them her word, like Caesar's, "might have stood against the world." The weight to be given to her testimony was, of course, for the jury. The only limitation placed upon their action in regard to what credit they would give to her evidence is the rule that other testimony must be produced which shall tend to corroborate her. The quantum of it will differ in accordance with the character of the witness and the facts of the particular case. In respect to an adventuress, whose air and demeanor upon the witness stand might disclose her true character, a jury might well hesitate to convict, though supported by abundant circumstances of corroboration. Whether in any given case they shall or do believe the accomplice is wisely by law committed to them. In this case the evidence shows that when the parties first became acquainted the prosecutrix, who it seems was a woman of rather an humble station, and an orphan girl, was living with the brother of appellant. It is not denied, and indeed seems to be conceded, and was indubitably proved on the trial that she was a woman of blameless life and unsullied reputation. The evidence shows that at the very time the intercourse between herself and appellant was being indulged in, she was received as a welcome guest at the hearthstone and around the fireside of his father and mother. She is shown to have been the associate and companion of his sister, and was by her, under this evidence, treated as an equal. That someone accomplished her ruin is, of course, certain. As stated, the evidence shows that the prosecutrix had neither father nor mother. Except that her heart belonged to another, she was mistress of her own fortunes and her own destiny. Therefore, there was no opportunity for the State to furnish testimony of either father or mother that the daughter had been sought in marriage by her suitor. The fact that she was alone in the world furnishes, too, some reason why the engagement should not be published, or the fact of the engagement communicated to her relatives. The jury knew, too, as we know, and, as sensible men, must here assume, that they took cognizance of the well known fact that frequently, if not indeed usually, such engagements are kept secret, and not disclosed until the wishes of the woman and the affairs of the man make it possible to early realize the hopes of the contracting parties. From these and other facts the jury might well find the promise of marriage, and not to believe same, in view of the character of the woman, the intimate association of the parties, was to close their eyes to the experience of the ages. There is no hint or suggestion in the evidence that she had such relations with any other person as would have made it among the possibilities for such other person to have secured her confidence, corrupted her mind and wrought her ruin. Indeed, the testimony clearly shows that so secure was appellant in her affections

and so thoroughly had he outstripped the rivals for her heart that they had dropped out of the race and left him undisturbed. The evidence clearly shows a general recognition among their acquaintances and friends of a relation more than that of merely passing acquaintances. In addition to this, as soon as the complaint was filed against appellant for seduction he flees the country, and is gone for a year. When her condition becomes known, and in jest some reference is made to his buying a gift for his boy, he falls in with the suggestion and says, yes, probably he had better buy it. There is no suggestion of disavowal of this responsibility, when, if he had been innocent of the transaction, every suggestion of self-preservation would have demanded and would certainly have induced a disavowal. It was a situation which from an honorable man, guiltless of any wrong, would have instinctively drawn such a disavowal. In view of their long and intimate association it is passing strange that if not guilty and not cognizant of her condition, and not responsible therefor, that no incredulity was expressed that she should have so fallen, nor pity for her sad state. On the contrary, her situation was treated as a matter of jest and idle sport. His conduct was only consistent with the conduct of one who had enjoyed her youth and beauty, and when the evidence of her downfall was at hand, had treated it and her situation as a matter of jest and idle sport. Would not any jury of twelve men find corroboration in their intimate association? Can we say they did not? Would they not find corroboration in his practical admission of the paternity of the child? Shall we say they must not? Would they not find corroboration in the fact that she had no other male acquaintance whose relations with her were at all intimate? Would they not above all find corroboration in her blameless life and pure character, her accepted state as a friend of the family, a guest of the home, and an associate of appellant's sister, and be slow to believe that any woman such as prosecutrix is shown to have been, would have surrendered her person on any other condition except in the belief that it was to her affianced husband? Again, would not the jury find corroboration in appellant's flight? If he was not guilty, why, as against this young girl without a family, should he flee, and if having sought flight, and was yet not guilty, why should he avoid arrest and remain away a year? These facts, as I believe, constitute corroboration and ample corroboration not only in respect to the intercourse, but in respect to the promise of marriage. So far from the verdict being unsupported by any testimony of corroboration which, in order to reverse the case, we must hold, from my point of view, no other conclusion is fairly inferable from the testimony except that appellant is guilty. We know that good and pure women, such as this woman was ere she was tempted and fell, do not yield to a casual acquaintance, and where, as in this case, we find a young man, her sole companion and associate, practically admitting the paternity of the child, in

the light of all the other attendant circumstances, and having in mind the Scriptural evidence "that the guilty as the wicked flee when no man pursueth," I can not hesitate to believe that he was guilty of the downfall of this young woman, and applying the safe and sane rules as judges that we would not hesitate to apply as men, I think we should hold, as I firmly believe, that the corroboration is sufficient, and the verdict abundantly supported by the evidence, and should not, in this condition of the record, undo the work of a jury properly impaneled, properly charged, and which has received the verdict and approval of a district judge of large experience on the bench. For my part, I can never consent to the institution of such a rule. I can never consent to a holding which determines, in substance, that a jury can not find from circumstances the fact of a promise of marriage when this fact is, as I believe in this record abundantly, if not conclusively, established. Let it ever be understood that in all that I have written, while all is in sorrow and regret, that not one word is to be understood in disparagement of or as reflection upon my associates. I accord to them the same singleness of purpose and the same honesty of opinion that I claim for myself.

It may be that I attach too much importance to the work and the opinions of this court, and its high office. I would have it always to be the great tribunal which the Constitution ordained and provided it should be—an asylum for the oppressed whose rights have been invaded, and a safe harbor for the innocent improperly convicted—but at the same time furnishing ever and always an anchor both true and steadfast, holding securely the fundamentals of our Constitution and preserving the peace of society and the wellbeing of our citizenship.

I have felt so great an interest in the question that I have at this great and perhaps unnecessary length written my views in the hope that like bread cast upon the waters, it may be returned to me after many days.

For these reasons I respectfully enter my dissent, in the hope that in some future and in some better day the views here expressed will come to be recognized as the law of this State.

ON REHEARING.

January 25, 1911.

HARPER, JUDGE.—On November the 9th of last year an opinion in this case was rendered by Presiding Judge Davidson of this court, in which Judge McCord concurred, reversing and remanding the case on the ground, in substance, that the verdict of the jury and judgment of the court were unsupported by the evidence in that there was not in the evidence sufficient proof of corroboration. From that opinion, as the record shows, Judge Ramsey dissented, filing at

the time a lengthy dissenting opinion. Soon thereafter a motion for rehearing was filed on behalf of the State, which was submitted on oral argument by Hon. John A. Mobley, then Assistant Attorney-General. On the 14th day of December thereafter Judge McCord prepared an elaborate opinion on the motion for rehearing, concurred in by Judge Ramsey, in which the State's motion was granted, the judgment reversed and set aside, and the cause affirmed. This opinion was not on that day handed down out of deference and respect to Judge Davidson, who had written the original opinion, and who was, as we were advised, detained at home on account of sickness. Judge Davidson not agreeing to the conclusion reached by Judge McCord, the matter remained in this condition until after the resignation of Judge Ramsey from the bench, and the case comes to us for decision. This much we have thought proper to state in view of the condition of the record as it will appear in the reports. Judge McCord's opinion is as follows:

"At a former day of this term of court the judgment in this case was reversed and remanded. The opinion was written by Presiding Judge Davidson, in which I concurred. Judge Ramsey dissenting.

The State has filed a motion for rehearing on the ground that the majority opinion was in error in holding the evidence insufficient to support the conviction. The majority opinion held that the prosecutrix was not sufficiently corroborated and that in order to convict a party of the crime of seduction it is necessary that the prosecutrix be corroborated both as to the promise of marriage and intercourse. The writer of this opinion has reached the conclusion that the majority opinion was wrong, and having changed his mind with regard to this matter, in justice to himself feels it is due that he should give the reasons for such change.

The crime of seduction is a statutory offense. It did not exist at common law. The master, guardian or parent might bring a civil action for damages for loss of service by reason of his ward, servant or child being debauched. The Legislature in 1858 passed an Act making it a penal offense, in this State, for any man under the promise of marriage to seduce and debauch any female under the age of twenty-five years. It was also provided that the woman seduced should not be permitted to testify. After the Legislature passed an Act permitting defendants in all criminal cases to testify, the Twenty-second Legislature lifted the ban off the seduced female and declared that she should be a competent witness, but that her testimony would have to be corroborated by other testimony tending to connect the defendant with the offense charged. Before the passage of this Act we had but few prosecutions for this offense, due largely to the fact that the seduced female could not testify. The statutes defining seduction in the different jurisdictions differ somewhat. Some of them merely make it a crime to seduce and debauch an unmarried female of good repute or of previous chaste character,

saying nothing of the means employed. Others make it a crime for any man under promise of marriage to seduce and have carnal intercourse with such a female. In other jurisdictions the offense consists in the act of persuading or inducing an unmarried woman of previous chaste character to depart from the path of virtue by the use of any species of arts, persuasions, or wiles which are calculated to have and do have that effect and resulting in her ultimately submitting her person to the sexual embraces of the person accused. See 35 Cyc., p. 1320. In some jurisdictions the female seduced is not required to be corroborated. This corroboration in some States, like ours, requires that the evidence of the prosecutrix shall be corroborated by other evidence tending to connect defendant with the offense charged. In other States she is required to be corroborated as to the promise of marriage, and where corroboration is required, the rule seems to be as follows: "The statute does not require the testimony of another witness, or direct and positive evidence, but the corroborating evidence may be supplied as well by facts and circumstances surrounding the transaction and otherwise established in the case. Nor need the corroboration be of such force as would prove the facts independently of the female's testimony. Where there is some testimony of other witnesses or other evidence supporting testimony on material questions in the case, it is for the jury to determine whether she is sufficiently corroborated." See 35 Cyc., p. 1363. The evidence in a seduction case to support a conviction is to be measured and governed by the rules of any other crime, and any rule that would require a departure from the ordinary rules of testing the sufficiency of the evidence or the amount of proof required, unless prescribed by the statute, would be out of harmony with the spirit of the criminal law. Now, the law provides in seduction, like any other crime, that any fact may be established by circumstantial evidence as well as direct. It simply lays down this rule with regard to this crime which would be applicable to any other case where the law made a witness an accomplice, that is, that no conviction can be had upon the testimony of the person whom the law denominates an accomplice, unless there is other evidence tending to, corroborate the witness as to the offense committed. The statute does not say in what this testimony shall consist. It uses language that practically is used in all cases where the State relies upon the testimony of an accomplice. No different rule is authorized. Therefore, when we go back to see what the courts have said with regard to testimony that tended to connect the defendant with the commission of the offense it simply means such facts and circumstances as will tend to show the defendant committed the offense and that the accomplice testimony is true. It does not require that the accomplice shall be corroborated in every material particular. It does not require the court to single out this element of the offense or that element and then direct the jury that unless the accomplice

is corroborated on this issue or that issue that they will acquit. Every crime consists of different elements. Murder in the first degree consists of express malice and the killing. Now, if an accomplice should be placed upon the stand who testified both to the express malice and killing, has this or any other court ever directed that the jury will not convict upon the testimony of the accomplice unless he had been corroborated both as to his testimony of express malice and of the killing? Or of burglary, has this court or any other court ever directed that before a conviction should be had upon the testimony of an accomplice as to the burglary that he must be corroborated, both as to the breaking and as to the intent? We say no. The statute does not say that the prosecutrix shall be corroborated as to the promise of marriage and intercourse, but says that she shall be corroborated by other evidence "tending" to show the commission of the offense. Mr. Webster's definition of "tend" or "tending" is "to stretch, extend, direct one's course; to be directed as to any end, object or purpose; to aim; to have or give a leaning." Therefore, we would gather from this article that if the circumstances lead toward or tend toward the defendant as the party who committed the offense and shows the truth of the prosecutrix, this would be all the law required. The writer of this opinion in the case of Williams v. State, 59 Texas Crim. Rep., 347, 128 S. W. Rep., 1121, uses this language: "It is insisted before this court that because there was no evidence corroborating her upon this point the conviction can not stand. We do not agree to this contention; all crimes have in them different issues and different elements that are required to be proved in order to sustain a conviction. The statute is general that the accomplice must be corroborated by other testimony, tending to connect the defendant with the commission of the offense. The statute does not say what this testimony shall consist of. If the testimony other than that of the accomplice should make out a complete offense, it would not be necessary to use the accomplice's testimony. Hence, the law wisely provides that the corroboration must tend to connect the defendant with the commission of the offense and to require that every constituent element of the offense, as sworn to by the accomplice, must be corroborated would be requiring of the State an impossibility." In the case of Myers v. State, 7 Texas Crim. App., 640, this language is used:

"The authorities are not agreed as to amount and extent of corroboration required in order to warrant conviction on the testimony of an accomplice who, in the sense of the witness, is any direct participant in the crime, but with this we need have no concern, for the simple reason the statute has settled it by declaring the extent of the corroboration necessary. It is 'other evidence tending to connect the defendant with the offense committed.' We do not understand that this requires that the different matters testified to by the accomplice are to be supported, each one, by other testimony to

the same isolated facts, but that it must tend to connect the defendant with the offense committed." As said in 1 Am. & Eng. Enc. of Law, p. 583, the testimony of the accomplice need not be corroborated on every material fact. So that, independent of his testimony, a conviction would be authorized, as this would in effect deny to the testimony of an accomplice all value. In the case of Criner v. State, 53 Texas Crim. Rep., 174, we find the following: "We have set out the testimony at this considerable length and have stated practically the testimony tending to connect appellant with the burglary. The rule is, of course, well settled, that before a conviction can be had upon the testimony of an accomplice that there must be other proof tending to connect the person charged with the commission of the offense. Just how strong in every case this corroborating testimony shall be must depend to a large extent upon the facts of each particular case. We believe that while not strong, that it could not in fairness be said that there was no corroborating testimony, or that it was so weak, indefinite or immaterial as to justify us in holding, in view of the verdict of the jury, that it was wholly lacking." In the case of Jackson v. State, 40 S. W. Rep., 998, in a case of incest this court says:

"We have examined the statement of facts carefully in order to ascertain if the testimony of the accomplice, Mattie Jackson, was corroborated by other evidence tending to connect the defendant with the commission of the offense. The evidence in this regard shows that appellant alone had access to prosecutrix and opportunity to have had carnal intercourse with her. The record abundantly shows that he had such opportunities. The testimony shows, by two witnesses, that she was enceinte; and her grandmother testified that she was so far gone in pregnancy that she took her away from school. Mattie Jackson testified that she was pregnant, seven months gone, and that she had never had intercourse with any other person except the appellant, who was her brother. We think the testimony tends to connect appellant with the commission of the offense." See the same rule in the case of Bales v. State, 44 S. W. Rep., 517; Faulkner v. State, 53 Texas Crim. Rep., 258, 109 S. W. Rep., 199, and in fact we believe that the rule laid down in the Myers case, supra, has, with regard to every other crime, other than seduction been followed and that this court has never in any crime other than seduction intimated as to what issues the prosecutrix had to be corroborated. There are some expressions in the opinions of our court on the subject of seduction that have led the profession into the belief that this court requires the State to prove and the trial court to charge the jury that before a party can be convicted of seduction the testimony of the prosecutrix will have to be corroborated both as to the promise of marriage and intercourse, and which have led toward the laying down of the rule that the corroboration as to these issues would have to be of the same character of proof and of the

same strength and cogency as the accomplice's testimony, both as to the promise of marriage and the intercourse, and by reason of these expressions considerable confusion has arisen and trial courts have been somewhat confused as to how to charge the jury in a case of seduction. We are at a loss to know why a different rule should obtain in seduction cases, from that regarding any other crimes.

Let us notice some of the decisions of this court where a rule has been attempted to be laid down as to the measure of corroboration of the accomplice's testimony. The first case that our attention has been called to where this court intimated that the prosecutrix had to be corroborated, both as to the promise of marriage and intercourse, will be found in the case of Gorzell v. State, 43 Texas Crim. Rep., 82, in which this language is used: "What has heretofore been said leads up to another proposition relied on by appellant, to wit, that the evidence does not sustain the verdict of the jury. In this connection, we believe appellant is correct. Prosecutrix, as stated before, testified as to the promise of marriage. The only evidence that can be said to support her on this point is one witness, to the effect that appellant said on one occasion that he was going to marry her, and it was further shown he was in the habit of associating with, writing to, and calling her 'Sweetheart.' If it be conceded that an agreement to marry existed between them, still it is not shown, outside of prosecutrix's own testimony, that appellant had carnal intercourse with her at any time. . . . The fact that appellant had carnal intercourse with prosecutrix is a vital issue in this case, and to obtain a conviction she must be corroborated upon this point." Now, what do we gather from this opinion? First, that the witness must be corroborated. How? By other testimony that defendant had had carnal intercourse with prosecutrix. In the Spenrath case, 48 S. W. Rep., 192, this court held that the evidence was insufficient to sustain the conviction because there was no corroborating evidence as to the promise of marriage, and reversed that case. In Woolley's case, 50 Texas Crim. Rep., 214, 96 S. W. Rep., 27, this court held the evidence insufficient because there was no testimony corroborating the prosecutrix as to the marital contract and as to the act of intercourse. This court says in that case: "It is necessary in a case of this character that the prosecutrix, who is an accomplice, be corroborated as to the marital contract and the intercourse with the alleged seducer." We have searched the books without avail to find where any such rule had ever been laid down by any court in any criminal case. In Howe's case, 51 Texas Crim. Rep., 174, while this case was affirmed by Judge Brooks, Judge Davidson dissented, and in his dissent used this language: "This court has uniformly and invariably held wherever the question has arisen that she must be corroborated, first, as to the act of intercourse on the part of the accused, and, second, as to his promise to marry her, as a predicate for the intercourse," and calls attention to the case of

Spenrath, supra, in support of this proposition. We have not found any case behind the Spenrath case, supra, that had ever attempted to lay down a rule as to the quantum, amount, or value of corroboration. The only rule that has even been established is that the corroborating evidence must be such as tends to connect the defendant with the offense charged; but here the court not only goes to the extent of saying in what she shall be corroborated, but rather leads to the conclusion that the corroborating evidence on these two issues must be of the same character of testimony as that of prosecutrix. If on the two vital issues she must be corroborated to the same extent as her own testimony would establish, then why use her at all? The rule to our mind is wrong. The decisions of this court, we think, wherever it has held that the proof of the accomplice must corroborate the prosecutrix as to the promise of marriage and intercourse, and that the court should so direct the jury in the trial of the case, should not be followed. In the case of Wright v. State, 31 Texas Crim. Rep., 354, is laid down, we think, the correct rule. Corroborative evidence need not be direct and positive or such evidence as is sufficient to convict independent of that of the prosecutrix, but simply such facts or circumstances as tend to support her testimony and which satisfy the jury she is worthy of credit. Or stated in another way, if the supporting testimony tends to show that the defendant committed the offense and shall satisfy the jury that she is worthy of credit and is telling the truth, then the law is satisfied and this was practically so held in the Beeson case, decided at this term and not yet reported. In the case of People v. Gumaer, 80 Hun, 78, the following is in substance held: "That on a trial for seduction under a promise of marriage evidence of defendant's attention to prosecutrix in the character of a suitor is sufficient corroboration of the testimony of prosecutrix." In the case of Armstrong v. People, 70 N. Y., 38, that court held that the evidence of the accomplice was corroborated when the State showed by proof of circumstances which usually attend an engagement to marry, such as exclusive attention to the female by defendant and the seeking and keeping her society in preference to that of other women. In Iowa, under a statute similar to ours, in the case of State v. Crawford, 34 Iowa, p. 40, it was held that corroborative testimony need not be of a character that goes directly to the commission of the offense, but such as will tend to strengthen and corroborate the testimony of the injured person and to point out the defendant as having committed the offense. In State v. Reinheimer, 109 Iowa, 624, it was held that the fact that the parties kept company, and acted as lovers usually do and other like circumstances, are sufficient corroboration of the evidence of prosecutrix required by statute. In State v. Smith, 84 Iowa, 522, it was held that direct corroborative evidence of the seductive arts or promises to obtain intercourse is not required, nor need the corroboration necessarily be as to all the

elements of the offense, and where the testimony of prosecutrix shows the offense, and to connect defendant therewith, she is corroborated by witnesses showing intimacy and courtship between the parties as well as actual intercourse, the case is for the jury and it is error to direct a verdict for defendant.

We deduce from the law that the prosecutrix is corroborated whenever there are any facts or circumstances that tend to show that the defendant committed the offense, and that whenever the court attempts to enlarge upon this rule by laying down a rule as to what particular issues of the case shall be corroborated, it is in error. Now, in this case the prosecutrix testified to the intercourse and the promise of marriage; the defendant was the only man who was shown affirmatively to have kept her company within the period of nine months prior to the birth of the child, with one exception, and he was with her at a time that would render it impossible for him to be the father of the child; she lived close to defendant's brothers and mother; she was an orphan girl; defendant had been waiting on her for two years; he went with her to church, to prayer-meeting, to social gatherings, public picnics, and she was the associate and companion of his sister; she lived part of the time with his family; she bore a splendid reputation; she was regarded as of a chaste and pure character; the testimony does not disclose a suspicion against her, and she was a fit associate of those that were the dearest to him, and but one young man had ever been seen in company with her other than the defendant, and he went with her home on one occasion.  Defendant had almost, we might say, the exclusive opportunity to commit this offense.  After it become noised abroad that the young lady was enceinte, he jokingly remarked that he ought to buy a mitt for his boy; when it became known in the country, he fled, went away and was gone a year.  The officers searched for him and could not find him; the testimony excludes the idea that anyone else was the author of her ruin; the testimony shows that the defendant not only believed her to be pure, but he knew it. For did he not know it, he would not have put her under the roof with his family, nor allowed his sister to associate with her.  Even when she went on a visit once, six miles off, defendant's own sister went in a buggy after her.  We think these circumstances tend most strongly to corroborate the prosecutrix that the defendant was not only the author of her ruin, and that he was not only engaged to her, but that he had intercourse with her under the promise of marriage.  The very fact that he was her exclusive company for two years is a circumstance corroborating her upon the question of marriage.  The very circumstances exclude the idea of anyone else having the opportunity; and his close companionship and association with her, shows that he was the author of her ruin.  The evidence to our minds abundantly shows the guilt of the defendant, and the evidence tending to corroborate the prosecutrix is all that the law

requires. Nor is the court called upon to direct the jury in what she shall be corroborated, or the amount and value of the corroboration. The defendant is guilty. The law has been satisfied.

Let the motion for rehearing be granted, the judgment of reversal be set aside, and the case affirmed.

McCord, Judge."

We have carefully read all the opinions prepared in the case, including an elaborate opinion recently prepared by Judge Davidson, in which he maintains with great force and ability the views originally entertained by him. In view of the differences between the members of the court as originally composed, we have ourselves invited argument on the State's motion, and have, in the light of such argument and the opinions theretofore prepared, and after a careful inspection of the record come to the conclusion that Judge McCord's opinion correctly states the facts, is a correct statement of the law, and should be as it is hereby in all things approved and affirmed.

There is no complaint of the trial court's charge. That he properly submitted the question of the corroboration of the witness Katie Weddell is admitted. Under our system the jury is the judge of the credibility of the witnesses and the weight to be given their testimony. The jury found that the witness was corroborated, and we are not disposed to disturb their finding on a question of fact.

It is therefore ordered that the motion of the State be and the same is hereby granted, the judgment of this court heretofore reversing and remanding the cause is set aside, and the judgment of conviction is hereby affirmed.

*Affirmed.*

ON REHEARING.

January 25, 1911.

DAVIDSON, PRESIDING JUDGE (dissenting).—It is urgently insisted by the Assistant Attorney-General, joined by Mr. Lattimore, the district attorney of the judicial district from which this appeal comes, in a motion for rehearing filed by the State, that this court is in error in reversing the judgment of the lower court. After a careful review of the record I can not agree with the views urged in the motion. To affirm the judgment would be to hold that no corroboration is necessary in a seduction case, thereby usurping the power of the law-making department of the State and overthrowing and destroying a plainly written statute. This I can not do and ought not to undertake. The following language occurs in the written argument for the State, to wit: "If the opinion of the majority of this court stands as rendered in this case, it will undoubtedly undermine and sap the strength of the law which was designed and intended to safeguard the home and its dearest and most important interest."

This to our minds, when construed in the light of the statute defining seduction and the one fixing the status as to the evidence of the alleged seduced female, is not only quite remarkable, but is fully an astounding proposition. This court had nothing to do with framing the definition of the offense, or fixing the character or quantum of evidence necessary to convict. This is a legislative question as much so as is the defining of any or every other offense and the annexing of penalties. This statute only proposes to punish for the seduction of an unmarried female under the age of twenty-five years. It does not provide, nor intimate a punishment of any female above the age of twenty-five years, married or unmarried, although she might be a constituent member of the family and as much entitled to the protection and safeguards thrown around the home as is a woman under twenty-five years of age. It does not protect the married woman, although she be under twenty-five years of age. Nor does it undertake to throw any safeguard around the home as such, either as to its dearest or its most important interest. Nor do we understand that by following the plain letter of this legislative enactment that this court will be destroying the safeguards of homes and their most important interest, nor would we thereby undermine or sap the foundations of society. To usurp legislative authority would be far more detrimental in the direction of undermining and sapping the strength of the law and in the destruction of the safeguards of the home and their dearest interest. This law of seduction, like every other statute defining a public wrong, is for the protection of society and not so much for the protection of the individual, and we could with as much propriety be called upon to change, enlarge, or modify the law of murder, rape, arson, burglary, robbery, etc., so as to punish, whether or no, a person charged with one of those offenses. To do so would give to this court the legislative power which it does not and can not, under the Constitution of this State, possess and it would destroy every vestige of safeguard which the law and Constitution throws around a person charged with crime.

While it is our duty to protect society in the manner pointed out by law, yet our duty is equally as plain and urgent to protect one charged with crime against an unfair and illegal trial or a wrongful verdict. He is as much entitled to have his rights safeguarded and fully protected by this court, whenever called upon to do so, as it is our duty to protect every other member of society. This constitutes the certainty which is said to be the glory of the law. The criminal laws of this State are not laws of vengeance, and were not made either to assist in individual revenge or to encourage sympathy in behalf of the person injured. If the individual has been injured in person or property, he or his representatives can find remedy under laws and statutes affecting private rights and remedies. The Constitution of this State has carefully provided for keeping separate the three departments of government—executive, legislative and judi-

cial. This is done, not only in behalf of individual liberty, but to insure the constitutional permanency of our State and form of government. Whenever the time may come when this provision of the Constitution can be disregarded, the Constitution with this wise provision will become a dead letter.

While this provision of the Constitution is made for the protection of both individual rights and the rights of the State, every article of the Bill of Rights is made for the protection of the individual against aggression by the State in the exercise of unlawful powers by any of its departments. We are not willing to give to any law a different construction from that which its context, words, subject matter and spirit shows to have been the legislative intention in framing it, for the purpose of enforcing the conviction of a man upon trial simply because some unfortunate victim may excite our sympathy. Penal Code, arts. 1, 3 and 9; White's Ann. P. C., secs. 4, 5 and 6, for collated cases.

The protection of individual liberty is the duty of courts, and not until some act done by him contrary to the penal law for which he is being tried, and shown by legal evidence to be guilty, can he lawfully be deprived of such liberty by the infliction of such penalty.

While everyone should sympathize with an unfortunate girl who may be the victim of someone's lust, such sympathy can not be had at the expense of plain judicial duty to such an extent as to cause us to place a construction upon a statute, neither intended, nor provided by the law-making power.

The statute of seduction has been construed too often by this court to warrant us in giving it a construction other than that heretofore given it. The court would certainly be, if not already there, upon dangerous grounds if a different construction as to well settled law has to be given every time a case comes before the court to meet some particular exigency. I fear that we have been drifting rather a long way and that it may be necessary to take our bearings occasionally and may be to call a halt.

Seduction is defined as follows: "If any person, by promise to marry shall seduce an unmarried female under the age of twenty-five years, and shall have carnal knowledge of such female, he shall be punished by imprisonment in the penitentiary not less than two nor more than ten years. Article 967, Penal Code.

It follows from this definition that five material facts are necessary to be proved by the State in order to secure a conviction and the failure to prove any one of these must result in an acquittal.

First. The woman alleged to have been seduced must have been at the time of the carnal act unmarried. Mesa v. State, 17 Texas Crim. App., 395. Otherwise she can not be the subject of seduction under a promise of marriage. Same case. See also Ferguson v. State, 71 Miss., 805; State v. Reed, 153 Mo., 451; Norton v. State, 72 Miss., 128.

Second. She must have been, at such time, under twenty-five years of age. This is as material and as absolutely important as the age of females in cases of rape, where conviction is sought in the absence of force upon a female under fifteen years of age.

Third. She must have been chaste, but morally corrupted, by the acts or words of the party alleged to have seduced her to the extent that she would have a less regard for her duty as to the virtue of chastity, than she would have had, but for the blandishments and wiles resorted to by him. However, as the law presumes every woman to be chaste, the prosecution is not required to prove her chastity. The want of chastity is a defensive matter which may be shown in defense of the accusation. The very fact of the law indulging in this presumption of chastity and the further fact that everyone charged with crime is presumed innocent until the contrary is shown, the burden is placed upon the State to prove that she has been seduced, that is, morally corrupted, by the acts or words or conduct of the person accused to that extent that she would have a less regard for her duty as a chaste and virtuous woman than she would otherwise have had. Putman v. State, 29 Texas Crim. App., 454; Brewer v. People, 27 Mich., 134; State v. Wenz, 41 Minn., 196. "The term seduction is used in the sense in which it is commonly understood." Art. 968, Penal Code.

It will be seen, therefore, that the Legislature did not attempt to give to the word "seduction" a meaning other than is given to it by common understanding, or as the statute says, as it is commonly understood, but having used it in connection with the words "carnal knowledge" and as one of the constituents of the offense, due regard and consideration, as intended by the Legislature, must be given to it and proof of this fact can be no more dispensed with than can the act of carnal knowledge, or the other constituent elements of the offense.

Fourth. She must have had carnal intercourse with the person accused of the offense. This must be the effect and result of his seductive influences and preceded by promise on his part to marry her, and she must yield her consent to the carnal knowledge from this promise of marriage alone and from no other cause or reason. This is a positive requirement of the law. Barnes v. State, 37 Texas Crim. Rep., 320, 39 S. W., 648.

Fifth. There must be a promise of marriage to her by the party accused, and, as before said, this must precede the act of carnal knowledge, and must not only induce the act, but be the exclusive reason of her consent to the act. Barnes v. State, supra, and cases there cited.

The proof of these five facts are necessary and absolutely essential to establish the corpus delicti; in other words, to make a complete offense, such as is defined by law. These constitute what our statute calls the "offense charged."

While the Legislature in its wisdom has permitted the injured female to testify, it has restricted the extent of her testimony to the extent that no conviction can be had alone upon such testimony. "In prosecutions for seduction, under the provisions of the Penal Code, the female alleged to have been seduced shall be permitted to testify; but no conviction shall be had upon the testimony of the said female, unless the same is corroborated by other evidence tending to connect the defendant with the offense charged." This language is found in art. 769, Code Crim. Proc.

The effect of this statute is to require that the female be corroborated by testimony other than her own tending, not only to identify the defendant as the guilty party, but also as to the commission of the "offense charged." In cases of seduction one includes the other and the testimony which goes to make the offense must necessarily, at the same time, identify the guilty party if such testimony be true. The law of accomplice as defined in article 781 of the Code of Crim. Proc., has no relation, as there understood, to the law of seduction. The term "accomplice" carries with it and implies guilt, and because of this fact, the law impeaches the testimony of the accomplice and prohibits a conviction upon his testimony alone. The law of seduction does not proceed upon the idea that the alleged seduced female is a particeps criminis, but regards her more in the light of a victim who has been overreached, seduced and debauched by and through deceptive wiles and promises of the seducer and one who would not have surrendered her virtue but for such deception. This aids the legal presumption of chastity. But the fact remaining that she is no longer a chaste woman, and as being one who has fallen, without reference to the means used—she having consented, imputes to her that want of moral stamina which would prevent her from being governed by revenge or resorting to any means by which her social condition would or could be bettered. The law regards the danger in which any man might be placed, though entirely innocent, if the same weight and credit be given to the testimony of a woman of that kind as to one whose moral character had not been corrupted to such extent as to cause her to part with her virtue. Hence, the law requires corroboration as a protection against her wiles, interests, or revenge or other motive.

So much for the law. Let us apply the facts as shown by the record. From an examination of the statement of facts we fail to find evidence tending to corroborate the witness, Katie Weddel, either as to the promise of marriage, the carnal intercourse with the defendant, or the seductive acts, or words necessary to corrupt, leading up to the act of carnal intercourse.

There is proof, undisputed, of carnal knowledge with someone. The child born to her is evidence of this fact; but with whom? Not with the defendant, because the quantum of evidence fixed by law to establish this fact has not been shown. The theory of the State,

however, seeks by a process of exclusion and elimination to raise the question of opportunity as a circumstance tending to corroborate Katie Weddel's testimony, and by such process exclude the idea that any person other than defendant is the father of the child. It will be difficult to find anywhere in the books a well considered case which holds that opportunity alone is of such probative force as to afford the corroboration required by law. In every instance there will be found in the record of cases other facts, such as letters, admissions or preparations for marriage or facts of like tenor going to support or in aid of opportunity. To hold opportunity alone to be sufficient would be to overthrow the *presumption* of *chastity in the woman* and that of *innocence in the man*. It would be to write every woman a *harlot,* and every man a debauchee, regardless of the chastity of the one and the absolute innocence and purity of intention of the other, in the face of the legal presumption that the *woman is chaste* and the *man innocent*. It would be to assume that the human family is so loosely constructed and morally weak that the mere appearance of a man in a woman's presence, unseen by others, would result in carnal intercourse. This court ought not to subscribe to so monstrous a doctrine. Upon the contrary it should cling to those sound and wise presumptions of law which writes that every woman is presumed to be chaste, and every man innocent until the contrary appears by legal and competent evidence. Now, what is claimed by the State as corroborating facts? The witness, Katie Weddel, alone testifies to the act of carnal intercourse and the promise of marriage. To corroborate her testimony as to the act of intercourse the State relies first, upon opportunity; second, the declaration of the defendant to the witness, Ed Elliott; third, as to the flight of the defendant. These we will consider in the order presented and mentioned.

First, as to opportunity. Katie Weddel testified: "I lived at Will Nash's two years. Me and Bob Nash were sweethearts two years. During that time he came to see me, and was my companion, and waited on me. During that time there were few others that went with me once or twice. These were Will Burns, Calvin Burns, Hugh Easton and Ezell Scott." In addition to those mentioned, it appears from the evidence of other witnesses that other young men visited her, to wit, Ed Elliott and Jim Bevill, and probably others, once or twice. Thus we see the opportunity was not exclusively by any means with the defendant. It is true that neither of the young men were with her as often as was the defendant, but this is immaterial. The *opportunity* was presented to them and each of them. There is one very cogent fact presented by Katie Weddel's testimony. The defendant was her companion for two years, and during the whole of that time, though the opportunity was frequently presented, he made no proposition of carnal intercourse to her until the time spoken of by her in her testimony, yet, according to her testimony, "he did not seem to be very timid to me at all." Upon several different

times and occasions prior to the night of the act of carnal intercourse, as testified by her, he had hugged her and she had hugged him several times, and upon three different times before any offer of marriage she had sat in his lap. These facts, together with the opportunity of others, taken in connection with the testimony of all the witnesses, both for the State and the defendant, as to the good character of defendant, both for honorable deportment and gentlemanly conduct, is not to be considered as a corroborative circumstance. Another fact may here be considered, as shown by the testimony of the witness, Katie Weddel. For about two months prior to the night that she states the act of intercourse occurred there had been an estrangement between her and defendant. They had ceased to be sweethearts and their attendance upon the social function on that particular night seems to have been the first time they had been together during this period of estrangement; and it is further to be noted, under the statement of facts, that there is no evidence of any offer upon his part of marriage at any time until they met by agreement at the garden after she had slipped out of the house. Taking these facts in connection with her testimony heretofore quoted and the manner of her meeting the defendant, does not lend probative force to the question of marital contract as being of that character that shows if appellant seduced her that it was done as contemplated by the statute and certainly does not show corroboration. No witness testified to the assignation at the garden but prosecutrix, or that they were together that night.

Second. The declaration of the defendant to Ed Elliott: Ed Elliott says: "I saw the defendant in town here one day *before the child was born,* and me and him was talking about a little baseball mitt and shoulder, and something was said about he ought to get that for his boy. Something like that was said. I don't remember exactly how it was, but there was something to that amount." And upon cross-examination he said: "I went with her (Katie Weddel) one time, but that was after Bob quit going with her. I went with her to a negro concert. I don't know whether or not Bob quit going with her about May, 1906, but I know that he was not going with her when I went with her. It was some time in the spring or summer after the negro school was out, and I suppose it was in 1906, I don't remember. If he was ever with her at all after I went with her I don't remember seeing him. That was in the spring before the child was born. I was joshing him about the baby, and there was something said about the mit; I think I brought it up myself. I might have been the one that suggested that he buy one for his boy; I won't be certain; we was talking and he said 'yes, he ought to buy it.'" The child was born on the 15th day of March, 1907. To give any weight to this testimony at all we must first assume that the "mantle of Elijah" had fallen on this witness. What boy was

he talking about? At that time Katie Weddel had not given birth to any child. Its sex was not and could not have been known. There is nothing in this conversation which in any way, without a wonderful stretch of imagination, connects the defendant with the subsequently born child of Katie Weddel. Her name was not mentioned; she was not in sight, so far as the testimony shown · or tends to show, nor does it appear from anything in the record that either Elliott or anyone else knew that the defendant was charged with the alleged offense until after this child had been born. The complaint had evidently not been lodged against the defendant, because at that time he was, according to the testimony of this witness, upon the streets of the county seat, while the sheriff testified that he made search for the defendant "on this charge of ·seduction" and could not find him. It is true, Elliott says, "I remember in the summer of 1906, when the complaint was ·made against him for seduction;" but this evidently was a mistake on his part, as no complaint was made at that time, as we gather from the record. This testimony can have no bearing whatever, we think, on this case, and can not be considered as a confession of the defendant's guilt. In fact, it ought not to have been admitted.

Third. As to the flight of the defendant. The evidence of flight is not sufficient. Independently of Katie Weddel's testimony there is nothing in the record suggesting the idea that the defendant knew anything of her seduction, or that any offense had been committed or that officers were seeking to arrest him. Granville Matthews, the constable, says: "I went out to arrest Bob Nash. I did not find him. I first went to Will Nash's and asked about him, and he said he was over at the old man's; and I went over to his father's and asked him where he was at, and the information that I got was that he was over in some woods, and I went over there and hunted the woods out for him and could not find him. I hunted for him about two hours, I guess, in the big woods in east of Mr. Nash's, but I could not find him. I kept a lookout for him until he finally surrendered, which must have been probably a year." The sheriff, Jim Frazier, says: "As such officer I made search for Bob Nash, the defendant in this case. I was not able to find him. I kept up the search about a month or three weeks and was not able to catch him." The evidence of flight is very meager and scarcely rises to the dignity of a circumstance. How or where this search was made does not appear. True, it appears that for two hours of the time one of the officers was in defendant's neighborhood, and searched through the woods, and upon inquiry as to the whereabouts of the defendant was informed that he was in the neighborhood. Charley Cawley says: "Bob left that community about the time this complaint was sworn out. It was probably a month or so before he left since I had seen him with her. It might have been three months. After the complaint was filed he left the country, and it

was something over a year after that before I saw him again.    I know that he went off hunting.    And when he came back the trouble was on."

Neither flight nor confession are admissible to prove the corpus delicti.    This, or in other words the offense, must be first shown, and not until then is evidence of such facts admissible.    When the corpus delicti has been established, however, in the manner required by law, then the testimony of confession and flight become admissible for the purpose of showing the defendant's connection with the offense charged to have been committed.    Here, however, the State is endeavoring to prove its whole case by such circumstances.    We must not be understood as holding that circumstantial evidence may not be had for the purpose of showing guilt, but what we do hold, is that before evidence of flight and confessions can be resorted to, the body of the offense must first be shown.    But here we would say that we fail to find any evidence of any confession in this record, and the mere fact of flight may be well attributable to other things or reasons as it would be to the question of seduction.    There are many things that actuate men to flee when they may not be guilty, but we deem it unnecessary to go into a discussion of those matters.    Katie Weddel alone testifies as to the carnal knowledge and the promise of marriage.    Both of these with the other constituents before mentioned are necessary to make out a case of the offense charged.    As the facts now stand, no offense has been legally shown to have been committed, because the law requires that before her testimony has any probative force whatever, there must be testimony tending to corroborate her.    How corroborate her?    Both as to the "offense charged" and the identity of the offender.    Here we have her, if corroborated at all, only as to the act of carnal intercourse.    Carnal intercourse alone does not make the offense, without the necessary proofs of promise of marriage, any more than proof of marriage without the carnal knowledge.    We would be as much justified in permitting a conviction to stand where the evidence showed a promise of marriage with no carnal knowledge, as we would be where carnal knowledge alone is shown without proof of the promise of marriage.    There is not one syllable of corroborative evidence in any way tending to show promise of marriage, or the meeting at the garden.

In some jurisdictions every material fact must be corroborated, while in others it is sufficient if the corroboration extends to a promise of marriage and to the intercourse.    In every jurisdiction, however, it is held there must be corroboration to the promise of marriage.    As is said in Rice v. Com., 100 Pa. St., 28: "In order to warrant a conviction of seduction under the promise of marriage there must be evidence to corroborate the testimony of the seduced female that there was a promise to marry.    The statute defining the offense is explicit, and the rule is not changed by the fact that a defendant can now testify in his own behalf."    And "mere proof

that the defendant had opportunity to employ seductive arts does not constitute evidence corroborative of the prosecuting witness." See State v. Smith, 54 Iowa, 743; State v. Araah, 55 Iowa, 258; State v. Painter, 50 Iowa, 317; State v. Hill, 91 Mo., 423. "On the trial of an indictment for seduction under a promise of marriage, the promise can not be proved by evidence of attentions, or the expressions of contrition for the seduction, and by a promise made after the seduction to marry the girl after a time." Cole v. State, 40 Texas, 147; Rice v. Com., 102 Pa. St., 408; People v. Clark, 33 Mich., 112; People v. Millspaugh, 11 Mich., 278.

The testimony of the witness, Katie Weddel, does not, to our minds, establish the fact that it was exclusively the promise of marriage and her reliance thereupon which caused her to yield to the acts of intercourse. See Simmons v. State, 55 Texas Crim. Rep., 441, 114 S. W. Rep., 841; Putman v. State, 29 Texas Crim. App., 454. She, the defendant, and several others, had just returned in a wagon from an ice-cream supper. She alone testifies to these facts. Outside of her evidence there is not a fact tending to show she ever even met appellant at the garden at night. This is where promise of marriage was made, if ever made. When they arrived where she was staying she and the defendant got out of the wagon. This was between ten and eleven o'clock at night. She was twenty-two years of age in December, 1909, and he was twenty-two September 14, 1909. She says: "When we got to the door he said he wanted to talk with me and asked me if I would go with him out there (the garden). He said he would wait for me, and I went in the house and put up my fan and handkerchief and some other things, and went in and turned down the cover on my bed. The reason I went in the house I knew they was all awake, and I went in there and slipped out when I came out. I didn't want them to know I left the room at all. I pulled off my shoes and went out in my stocking feet. I did not change any of my clothes, and did not take off any of my clothes, except my shoes. When I came out he was out by the side of the garden waiting for me, and asked me to sit down, and I sat down, and we talked on awhile, and he asked me to submit to him, and he promised to marry me. I don't know that I can remember every word that he said to me, but he asked me if I still loved him, and I told him yes (which I did), and he asked me to submit to him, and I would not do it, and he said, well, you know I would not harm a hair on your head. He says, you know I would not betray you. He says, you know I would not harm you for anything on earth. He just asked me if I would let him have it, and I didn't want to at first, and he kept insisting, and I finally agreed. I asked him what would he do. I said people will be finding this out. He says, no, they won't know anything about it. He says, we mean to get married and we will get married before anybody knows anything about it. He says, there will be no harm done, and nobody knows it.

I says, 'Well, maybe not.' I did not have any feeling or desire for sexual intercourse right at the time I consented, and did not have any desire for it before I consented. He had his arms around me while we were sitting down. I put my arms around him, and he put his arms around me. We sat there in that position but a very few minutes." Then again, "I had no desire whatever to have sexual intercourse before we laid down on the ground." The testimony here detailed is absolutely inconsistent with the idea that she yielded her virtue alone upon her belief in the promise of marriage. Every fact detailed by her points to the conclusion that she prepared for the act of carnal intercourse. The crafty manner in which she sought to deceive the people of the house into the belief that she had gone to bed, the secret and clandestine manner in which she left the house, having first pulled her shoes off, savors more of an assignation than it does of one expecting a promise of marriage. These facts when taken in connection with the testimony of Mrs. George Willis show an intent and purpose on Katie Weddel's part to place the defendant in a position where he would be compelled to marry her. Mrs. Willis says: "She (Katie Weddel) told me that if she could not get Bob Nash one way she would another." This testimony of the prosecutrix smacks more of a bargain and barter than it does of a surrender of virtue in good faith upon a promise of marriage.

As was said in State v. Reeves, 97 Mo., 668: "No one can, with any degree of plausibility, contend that a virtuous female can be seduced without any of those arts, wiles and blandishments so necessary to win the hearts of the weaker sex. To say that such a one was seduced by simply a blunt offer of wedlock in futuro, in exchange for sexual favors in presenti, is an announcement that smacks too much of a bargain and barter, and not enough of betrayal. This is hire or salary, not seduction."

I can see no sufficient testimony in this record to support this conviction. Wherefore, the motion for rehearing ought to be overruled. I therefore enter my dissent.

ON REHEARING.

February 22, 1911.

PRENDERGAST, JUDGE.—Soon after I came upon the bench, and some time before Judge Harper delivered the opinion in this case on January 25, 1911, at his instance, I carefully studied the case, read the whole record and the various opinions that had been delivered therein. I then fully agreed with him in the opinion rendered by him.

Since then, at the instance of the appellant, we have heard an able and forcible oral argument and written arguments on the appellant's motion for rehearing by his attorneys herein. Again, at Judge Harper's instance, I have carefully studied the case and have been more

fully convinced than ever that this case has been properly affirmed, and that the opinions herein rendered by Judges Harper and Ramsey is the law and is applicable to this case, and that the case should in all things be affirmed.

There had been so much said and written in this case on the question of the corroboration of the injured party, Miss Weddel, and all on that question alone, that we were inadvertently led to say in Judge Harper's opinion that there was no complaint of the trial court's charge. In that, however, we were mistaken. Our attention has been called thereto, and all these various matters forcibly and ably presented by appellant's counsel. We have, therefore, carefully gone over all of them. We deem it unnecessary to state them or to particularly discuss them. Suffice it to say that it is our opinion that there is no reversible error presented by any of those questions.

Being thoroughly convinced and fully satisfied that the judgment of conviction in this case is correct, and that the injured party was fully and satisfactorily corroborated as required by law, it is our opinion that the appellant's motion for rehearing should in all things be overruled, and it is hereby so ordered.

DAVIDSON, Presiding Judge (dissenting).—I deem it unnecessary to further discuss the facts. The charge is not discussed. I therefore deem it only necessary to say under Simmons v. State, 54 Texas Crim., 619, it is wrong.